

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 18, 2017**

_Barbara J. Houser_

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: PROVIDER MEDS, LLC | § | CASE NO. 13-30678 |
| | § | |
| Debtor. | § | |
| | § | CHAPTER 7 |
| TECH PHARMACY SERVICES, INC. | § | |
| d/b/a ADVANCED PHARMACY AND | § | |
| ADVANCED PHARMACY SERVICES, | § | ADVERSARY PROCEEDING |
| | § | NO. 15-03101 |
| Plaintiff, | § | |
| | § | |
| VS. | § | |
| | § | Removed from the 162nd Judicial |
| RPD HOLDINGS, LLC, | § | District Court for Dallas County, Texas, |
| | § | Cause No. DC-15-05744 |
| Defendant. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING TRIAL

The Court tried this adversary proceeding, which was removed from Texas state court, on

January 11, 2017. While there were more parties and issues pending before the state court at the

time of removal, Tech Pharmacy Services, Inc. d/b/a Advanced Pharmacy and Advanced

Pharmacy Services ("**Tech Pharm**") and RPD Holdings, LLC ("**RPD**") agreed to dismiss the

other parties and narrowed the issues for trial. *See* "Stipulation and Agreed Order Dismissing

Various Parties Without Prejudice," entered on August 19, 2016 [ECF No. 44].[1] Stated most

simply, the issue to be decided by this Court is whether a license agreement embodied in a

"Compromise, Settlement, Release and License Agreement" (the "**License**"), [Ex. 2],[2] filed in

the United States District Court for the Eastern District of Texas, which resolved prior patent

infringement litigation between Tech Pharm and the Onsite Parties (as defined in the License),

was sold, assigned, or otherwise transferred to RPD in certain of the Onsite Parties' bankruptcy

cases by a prior Order of this Court, thus granting RPD a right to use the property covered by the

License.

Based on the facts stipulated to by the parties and/or found by the Court, and for the

reasons explained below, the Court concludes that (i) the License was not sold, assigned or

otherwise transferred to RPD in certain of the Onsite Parties' bankruptcy cases by a prior Order

of this Court, and (ii) RPD has no right to use the property covered by the License pursuant to

any such Orders.

**STIPULATED FACTS**

The Parties stipulated to the following facts in the Joint Pretrial Order they submitted to

the Court, which was entered on the docket on December 29, 2016 [ECF No. 86]:[3]

---

[1] References to documents filed on the docket in this adversary proceeding will cited to as ECF followed by the docket number of the document in question. So, this stipulation appears at docket number 44 in this adversary proceeding. References to documents filed on the docket in one of the debtors' main bankruptcy cases will be cited to by referring first to the main case number followed by the applicable ECF number.

[2] Tech Pharm's and RPD's admitted trial exhibits include many of the same documents. For the Court's ease, trial exhibit references will be to Tech Pharm's admitted exhibits, unless explicitly noted.

[3] While the Court edited the parties' factual stipulations from the Joint Pretrial Order in minor respects, none of the Court's changes were substantive. To the extent that a party believes a Court change was substantive, the Court relies instead on, and adopts herein, the factual stipulations as set forth in the Joint Pretrial Order.

1.      Tech Pharm holds United States Patent No. 7,698,019 (the "**Patent**").

2.      On July 22, 2010, Tech Pharm filed a complaint (the "**Patent Infringement Case**") in the United States District Court for the Eastern District of Texas, alleging infringement of its Patent, against multiple defendants, including, for purposes of this Adversary Proceeding, ProvideRx of Grapevine, LLC ("**Grapevine**"), ProvideRx of Waco, LLC ("**Waco**"), W PA OnSiteRx, LLC ("**W. Pa.**"), Provider Meds, LP ("**Provider Meds**"), OnSiteRx, Inc. ("**OnSite**"), and ProvideRx of San Antonio, LLC ("**San Antonio**," collectively with Grapevine, Waco, W. Pa., Provider Meds, and OnSite, the "**Debtors**").

3.      The Debtors, jointly, were generally in the business of dispensing pharmaceuticals to third parties, including long term care facilities and nursing homes, and further including the use of remote pharmaceutical dispensing machines.  It was the use of these machines that was the basis of Tech Pharm's patent infringement suit.

4.      The Debtors, and others, counterclaimed Tech Pharm in said suit seeking the invalidity of the Patent.

5.      On or about April 26, 2012, Tech Pharm, on the one hand, and the Debtors (except Debtor Onsite), Provider Technologies, Inc., ProvideRx of PA, LLC, ProvideRx of Midland, LLC, Provider Business Solutions, Inc., Pharmacy Technologies, Inc., Pharmacy Solutions, L.P., and Reef R. Gillum ("**Gillum**"), on the other hand (collectively, the "**OnSite Parties**"), entered into a *Compromise, Settlement, Release and License Agreement* (the "**License**") in connection with a resolution of the Patent Infringement Case.

6.      The License was filed in the Patent Infringement Case and is a matter of public record.

7.      The License is non-exclusive.

8.      On December 28, 2012, Grapevine filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby initiating Bankruptcy Case No. 12-38039 before this Court (the "**Grapevine Case**").  On August 30, 2013, the Court entered an order converting the Grapevine Case to Chapter 7, whereafter Areya Holder (the "**Grapevine Trustee**") was appointed as the Chapter 7 trustee of the Grapevine bankruptcy estate (the "**Grapevine Estate**").

9.      The Grapevine Case remains open.

10.     On May 22, 2013, W. Pa. filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby initiating Bankruptcy Case No. 13-32615 before this Court (the "**W. Pa. Case**").  On August 30, 2013, the Court entered an order converting the W. Pa. Case to Chapter 7, whereafter Robert Yaquinto, Jr. (the "**W. Pa. Trustee**") was appointed as the Chapter 7 trustee of the W. Pa. bankruptcy estate (the "**W. Pa. Estate**").

11.     The W. Pa. Case was closed on October 31, 2016, with the W. Pa. Trustee discharged.

12.     On June 11, 2013, Waco filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby initiating Bankruptcy Case No. 13-33017 before this Court (the "**Waco Case**").  On September 4, 2013, the Court entered an order converting the Waco Case to Chapter 7, whereafter Jeffrey H. Mims (the "**Waco Trustee**") was appointed as the Chapter 7 trustee of the Waco bankruptcy estate (the "**Waco Estate**").

13.     The Waco Case was closed on May 14, 2015, with the Waco Trustee discharged.

14.     On June 11, 2013, San Antonio filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby initiating Bankruptcy Case No. 13-33018[4] before this Court (the "**San Antonio Case**").  On September 3, 2013, the Court entered an order converting the San

---

[4] For example, in the factual stipulations contained in the Joint Pretrial Order, the wrong case number is given for the San Antonio Case.  The Court corrected the case number here.

Antonio Case to Chapter 7, whereafter James W. Cunningham (the "**San Antonio Trustee**") was appointed as the Chapter 7 trustee of the San Antonio bankruptcy estate (the "**San Antonio Estate**").

15.     The San Antonio Case remains open.

16.     On February 6, 2013, Provider Meds filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby initiating Bankruptcy Case No. 13-30678 before this Court (the "**Provider Meds Case**").  On September 4, 2013, the Court entered an order converting the Provider Meds Case to Chapter 7, whereafter Diane G. Reed (the "**Provider Meds Trustee**") was appointed as the Chapter 7 trustee of the Provider Meds bankruptcy estate (the "**Provider Meds Estate**").

17.     The Provider Meds Case remains open, although the Provider Meds Trustee's final report has been filed and may be approved by the time of trial.[5]

18.     On January 21, 2013, OnSite filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby initiating Bankruptcy Case No. 13-30267 before this Court (the "**OnSite Case**").  On September 4, 2013, the Court entered an order converting the OnSite Case to Chapter 7, whereafter John Dee Spicer (the "**OnSite Trustee**") was appointed as the Chapter 7 trustee of the OnSite bankruptcy estate (the "**OnSite Estate**").

19.     The OnSite Case was closed on July 14, 2016, with the OnSite Trustee discharged.

20.     None of the Debtors scheduled the License anywhere on their schedules, including Schedule B and G.  None of the Debtors anywhere scheduled Tech Pharm on their schedules, whether as a creditor or otherwise.

---

[5] The final report was not approved by the time trial concluded.

21. On November 23, 2013, the Grapevine Trustee, in the Grapevine Case, filed her *Trustee's Motion Pursuant to 11 U.S.C. § 363(b) and (f) for Approval to Sell Property Free and Clear of Liens, Claims, Encumbrances, and Interests and to Assume and Assign Licenses as Part of Same* (the "**Grapevine Sale Motion**"), pursuant to which the Grapevine Trustee sought approval to sell various property of the Grapevine Estate to RPD pursuant to that certain *Asset Purchase Agreement* attached to the Grapevine Sale Motion (the "**Grapevine APA**").

22. The certificate of service to the Grapevine Sale Motion does not reflect the service thereof, or the notice of hearing thereon, on Tech Pharm.

23. The License was not expressly identified as an asset being assumed and assigned or otherwise transferred in either the Grapevine Sale Motion or the Grapevine APA.

24. On January 13, 2014, the Court, in the Grapevine Case, entered its *Order Granting Trustee's Motion Pursuant to 11 U.S.C. § 363(b) and (f) for Approval to Sell Property Free and Clear of Liens, Claims, Encumbrances, and Interests and to Assume and Assign Licenses as Part of Same* (the "**Grapevine Sale Order**"), by which the Court approved the Grapevine Sale Motion and the Grapevine APA.

25. On November 22, 2013, the W. Pa. Trustee, in the W. Pa. Case, filed his *Trustee's Motion to Sell Property of the Estate Free and Clear of Liens, Claims, Interests and Encumbrances and to Assume and Assign Licenses as Part of Same* (the "**W. Pa. Sale Motion**"), pursuant to which the W. Pa. Trustee sought approval to sell various property of the W. Pa. Estate to RPD pursuant to that certain *Asset Purchase Agreement* attached to the W. Pa. Sale Motion (the "**W. Pa. APA**").

26. The certificate of service to the W. Pa. Sale Motion does not reflect the service thereof, or the notice of hearing thereon, on Tech Pharm.

27.     The License was not expressly identified as an asset being assumed and assigned or otherwise transferred in either the W. Pa. Sale Motion or the W. Pa. APA.

28.     On January 13, 2014, the Court, in the W. Pa. Case, entered its *Order Granting Trustee's Motion Pursuant to 11 U.S.C. § 363(b) and (f) for Approval to Sell Property Free and Clear of Liens, Claims, Encumbrances, and Interests and to Assume and Assign Licenses as Part of Same* (the "**W. Pa. Sale Order**"), by which the Court approved the W. Pa. Sale Motion and the W. Pa. APA.

29.     On September 9, 2014, the Waco Trustee, in the Waco Case, filed his *Emergency Motion Pursuant to 11 U.S.C. § 363 and Federal Rule of Bankruptcy Procedure 9019 to Approve Sale of Assets and Settlement Agreement Between Trustee and RPD Holdings, LLC* (the "**Waco Sale Motion**"), pursuant to which the Waco Trustee sought approval to sell various property of the Waco Estate to RPD pursuant to that certain *Settlement and Asset Purchase Agreement* attached to the Waco Sale Motion (the "**Waco APA**").

30.     The certificate of service to the Waco Sale Motion does not reflect the service thereof, or the notice of hearing thereon, on Tech Pharm.

31.     RPD was not aware that the License existed until September 15, 2014, when it was informed of the existence of the License by CERx Pharmacy Partners ("**CERx**").

32.     On September 22, 2014, the Court, in the Waco Case, entered its *Order Granting Emergency Motion Pursuant to 11 U.S.C. § 363 and Federal Rule of Bankruptcy Procedure 9019 to Approve Sale of Assets and Settlement Agreement Between Trustee and RPD Holdings, LLC* (the "**Waco Sale Orde**r"), which the Court signed on September 19, 2014.  By the Waco Sale Order, the Court granted the Waco Sale Motion and approved the Waco APA.

33.     On September 30, 2014, the San Antonio Trustee, the Provider Meds Trustee, and the OnSite Trustee, in their respective cases, filed the identical *Motion Pursuant to 11 U.S.C. § 363 and Federal Rule of Bankruptcy Procedure 9019 to Approve Sale of Assets and Settlement Agreement By and Among Trustees Reed, Spicer, and Cunningham, RPD Holdings, LLC and CERx Pharmacy Partners, LLP* (the "**Master Sale and Settlement Motion**").  Pursuant to the Master Sale and Settlement Motion, the San Antonio Trustee, the Provide Meds Trustee and the OnSite Trustee sought approval of a *Compromise, Sale and Settlement Agreement* (the "**Master Settlement Agreement**").

34.     The Master Settlement Agreement was not mailed with the Master Sale and Settlement Motion, as indicated on the Certificate of Service affixed to the Master Sale and Settlement Motion.[6]

35.     The Court held a hearing on the Master Sale and Settlement Motion on November 5, 2014, at which the Court granted the Master Sale and Settlement Motion.  On November 5, 2014, in the bankruptcy cases of San Antonio, Provider Med and OnSite, the Court entered its identical *Order Granting Motion Pursuant to 11 U.S.C § 363 and Federal Rule of Bankruptcy Procedure 9019 to Approve Sale of Assets and Settlement Agreement By and Among Trustees Reed, Spicer, and Cunningham, RPD Holdings, LLC and CERx Pharmacy Partners, LLP* (the "**Master Sale and Settlement Order**").

36.     On May 20, 2015, Tech Pharm filed a petition with the Dallas County District Court against, among others, Waco and San Antonio.

37.     On June 22, 2015, Tech Pharm amended its petition to add various new defendants.

---

[6] While the Master Settlement Agreement, which was Exhibit A to the Master Sale and Settlement Motion, was not served with the Master Sale and Settlement Motion, parties were told that it could be obtained from PACER or by contacting counsel for the Provider Meds Trustee.  Master Sale and Settlement Motion [Ex. 14] at p. 17.

38.     On August 7, 2015, RPD filed its petition in intervention into the state court proceeding.

39.     On August 13, 2015, RPD removed the state court proceeding in its entirety to this Court, thereby initiating this Adversary Proceeding.

The Court adopts the above 39 factual stipulations, as well as an additional factual stipulation the parties agreed to and filed with the Court on January 9, 2017 [ECF No. 89], set forth below:[7]

40.     The parties hereby agree and stipulate that none of the trustees of the chapter 7 estates of W. Pa, San Antonio, Grapevine, and Waco had actual knowledge of the License at any time prior to the entry of the orders approving the respective motions to sell the property of the respective estates to RPD.

**ADDITIONAL FACTS FOUND BY THE COURT**

41.     Pursuant to the License, Tech Pharm granted the Onsite Parties "a non-exclusive perpetual license … to practice the '019 Patent and/or Divisionals or Continuations thereof, whether now issued or presently pending … so long as the Patent or Patents are valid and enforceable." License [Ex. 2] at ¶ 1.

42.     Assignment of the License is limited by its terms, providing that:

This License may be assigned by any OnSite Party to any party within the United States as part of a sale, acquisition, or change in control of its business to which this Agreement relates, if and only if the assignee undertakes, in writing, to be bound by all of the obligations of this Agreement.

*Id*. at ¶ 2.

---

[7] While the Court edited this stipulation in minor respects, none of the Court's changes were substantive. To the extent that a party believes a Court change was substantive, the Court relies instead on, and adopts herein, the factual stipulation contained in the filed Stipulation at ECF No. 89.

43.     As previously found, the Debtors filed chapter 11 cases in this Court between December 28, 2012 and June 11, 2013.

44.      Gillum filed a personal chapter 7 petition on August 13, 2013.  Case No. 13-34156, ECF No. 1.

45.     Notice of the filing of the Debtors' bankruptcy cases was not given to Tech Pharm.

46.     No one at Tech Pharm was aware of any of the Debtors' bankruptcy cases until October 2014 at the earliest.  Answers to Interrogatories [Ex. 38 and Ex. YY at pp. 7-8].[8]

47.     Each of the Debtors' chapter 11 cases was subsequently converted to a case under chapter 7.  Specifically, (i) the Grapevine Case was converted on August 30, 2013 (*see* Case No. 12-38039 [ECF No. 137]); (ii) the W. Pa. Case was converted on August 30, 2013 (*see* Case No. 13-32615 [ECF No. 47]); (iii) the Waco Case was converted on September 4, 2013 (*see* Case No. 13-33017 [ECF No. 46]); (iv) the Provider Meds Case was converted on September 4, 2013 (*see* Case No. 13-30678 [ECF No. 27]); (v) the San Antonio Case was converted on September 3, 2013 (*see* Case No. 13-33018 [ECF No. 48]); and (vi) the Onsite Case was converted on September 4, 2013 (*see* Case No. 13-30267 [ECF No. 30]).

48.     As reflected on the Court's docket in each of the Debtor licensee's bankruptcy case, if the License is an executory contract, no trustee of a Debtor licensee moved to extend the deadline by which he/she would have been obligated to assume the License before the 60-day deadline provided by 11 U.S.C. § 365(d)(1) expired.

49.     If the License is an executory contract that could be assumed, the deadline by which to do so expired on the following dates:

---

[8] Exhibit YY is a trial exhibit offered by RPD and admitted by the Court.

| Debtor[9] | Conversion Order Date | 60-Day Period Expired/ Deemed Rejection Date | Sale Motion or Settlement Motion Filed |
|---|---|---|---|
| Grapevine | 8/30/2013 | 10/29/2013 | 11/23/2013 |
| W. Pa. | 8/30/2013 | 10/29/2013 | 11/22/2013 |
| Waco | 9/4/2013 | 11/3/2013 | 9/9/2014 |
| Provider Meds | 9/4/2013 | 11/3/2013 | 9/30/2014 |
| San Antonio | 9/3/2013 | 11/2/2013 | 9/30/2014 |

50.     On November 23, 2013, the Grapevine Trustee filed the Grapevine Sale Motion, pursuant to which she sought to sell the "Subject Property" (as defined in the Grapevine APA) pursuant to the terms of the Grapevine APA.  Grapevine APA [Ex. 4, Ex. A].  Two licenses comprised a part of the Subject Property, but the License was not one of them.  Rather, the two licenses that comprised a part of the Subject Property were (i) the OnSiteRx software license, and (ii) the MDI Achieve sublicense from GFMHT.  *Id.* at p. 1.  As it relates to those two licenses, the Grapevine Trustee stated in the Grapevine Sale Motion that she "does not believe that [those licenses] are 'executory contracts' within the meaning of section 365(a) of the Bankruptcy Code. However, in the event that [they] are executory contracts, the Trustee seeks authority to assume and assign the same to RPD only in the event that this Motion is otherwise granted."  Grapevine Sale Motion [Ex. 4] at ¶ 25.

51.     The Grapevine APA is governed by Texas law.  Grapevine APA [Ex. 4, Ex. A] at p. 4.

52.     The Grapevine APA was drafted jointly by the Grapevine Trustee and RPD.  *Id.*

53.     The Grapevine APA does not identify the License as an asset being sold pursuant to section 363(b) of the Bankruptcy Code or assumed and assigned pursuant to section 365(a) and (f) of the Bankruptcy Code.  The License is simply not mentioned in the Grapevine Sale Motion or the Grapevine APA.

---

[9] Onsite is not included in the chart because it was not a party to the License and thus there was nothing for the Onsite Trustee to assume.

54.     On January 13, 2014, the Court entered the Grapevine Sale Order, which approved the sale of the "Subject Property" to RPD.  *See* Grapevine Sale Order [Ex. 6].

55.     On November 22, 2013, the W. Pa. Trustee filed the W. Pa. Sale Motion, pursuant to which he sought to sell the "Subject Property" (as defined in the W. Pa. APA) pursuant to the terms of the W. Pa. APA.  W. Pa. Sale Motion [Ex. 7].  Two licenses comprised a part of the Subject Property, but the License was not one of them.  Rather, the two licenses that comprised a part of the Subject Property were (i) the OnSiteRx software license, and (ii) the MDI Achieve sublicense from GFMHT.  W. Pa. APA [Ex. 7, Ex. A] at p. 1.  As it relates to those two licenses, the W. Pa. Trustee stated in the W. Pa. Sale Motion that he "does not believe that [those licenses] are 'executory contracts' within the meaning of section 365(a) of the Bankruptcy Code.  However, in the event that [they] are executory contracts, the Trustee seeks authority to assume and assign the same to RPD only in the event that this Motion is otherwise granted."  W. Pa. Sale Motion [Ex. 7] at ¶ 24.

56.     The W. Pa. APA is governed by Texas law.  W. Pa. APA [Ex. 7, Ex. A] at p. 15.

57.     The W. Pa. APA was drafted jointly by the W. Pa. Trustee and RPD.  *Id.*

58.     The W. Pa. APA does not identify the License as an asset being sold pursuant to section 363(b) of the Bankruptcy Code or assumed and assigned pursuant to section 365(a) and (f) of the Bankruptcy Code.  The License is simply not mentioned in the W. Pa. Sale Motion or the W. Pa. APA.

59.     On January 13, 2014, the Court entered the W. Pa. Sale Order, which approved the sale of the "Subject Property" to RPD.  W. Pa. Sale Order [Ex. 9].

60.     On September 9, 2014, the Waco Trustee filed the Waco Sale Motion, pursuant to which he sought to sell the "Subject Property" (as defined in the Waco Sale Motion) pursuant to

the terms of the Waco APA, an executed copy of which was attached to the Waco Sale Motion. Waco Sale Motion [Ex. 10]. In other words, although undated, the Waco APA was executed by the Waco Trustee and RPD on or before September 9, 2014 when the Waco Sale Motion was filed. Waco APA [Ex. 10, Ex. A]. While a software license agreement between Waco, Provider Technologies and Provider Meds comprises a part of the Subject Property, that is not a reference to the License. Moreover, while other Intellectual Property (as defined in the Waco APA) comprises a part of the Subject Property, that is not a reference to the License either for the reasons explained below. *See infra* at Conclusion of Law 3.

61. The Waco APA is governed by Texas law. Waco APA [Ex. 10, Ex. A] at p. 6.

62. The Waco APA was drafted jointly by the Waco Trustee and RPD. *Id.*

63. On September 22, 2014, the Court entered the Waco Sale Order, which approved the sale of the "Subject Property" to RPD. *See* Waco Sale Order [Ex. 12].

64. As previously found, RPD did not become aware of the existence of the License until September 15, 2014.

65. RPD did not become aware of the existence of the License until it was told about it by an agent of CERx. September 2014 Emails [Ex. 49] at p. 6864. The Grapevine Trustee, the W. Pa. Trustee, and the Waco Trustee learned of the existence of the License after RPD became aware of its existence. September 26, 2014 Email [Ex. 46].

66. The Grapevine Sale Order and W. Pa. Sale Order were entered before RPD, the Grapevine Trustee, and the W. Pa Trustee knew that the License existed.

67. The Waco APA was executed and the Waco Sale Motion was filed and heard before RPD and the Waco Trustee knew that the License existed.

68.     On September 30, 2014, the Master Sale and Settlement Motion was filed by the San Antonio Trustee, the Provider Meds Trustee and the Onsite Trustee. Master Sale and Settlement Motion [Ex. 14].

69.     Attached to the Master Sale and Settlement Motion as filed was the Master Settlement Agreement. Master Settlement Agreement [Ex. 14, Ex. A].

70.     The Master Sale and Settlement Motion did not seek authority to sell or assume and assign any rights to or under the License to RPD. Rather, the Master Sale and Settlement Motion provided for (i) the San Antonio Trustee's sale of substantially all of the San Antonio Estate's assets *to CERx* "including, without limitation, … rights to or under the Tech Pharm License,"[10] and (ii) the Provider Meds Trustee's sale *to CERx* of Provider Meds' "rights to or under the Tech Pharm License." Master Sale and Settlement Motion [Ex. 14] at ¶ 3.

71.     The Master Sale and Settlement Motion makes no reference to an assumption and/or assignment of the License. In fact, the Master Sale and Settlement Motion does not mention section 365 of the Bankruptcy Code or its requirements at all.

72.     None of Grapevine, W. Pa. or Waco, or the respective trustees thereof, is a party to the Master Settlement Agreement and the Master Sale and Settlement Motion was not filed in any of their respective bankruptcy cases. Master Sale and Settlement Motion [Ex. 14, Ex. A]; *see also* dockets in the Grapevine Case, the W. Pa. Case, and the Waco Case where there is no docket entry evidencing the filing of the Master Sale and Settlement Motion in each such case.

73.     The Master Settlement Agreement was not served on those parties receiving service of the Master Sale and Settlement Motion by first class mail, including Tech Pharm. Master Sale and Settlement Motion [Ex. 14] at p. 17.

---

[10] The Tech Pharm License, as defined in the Master Settlement Agreement, is the License as defined here.

74.     Although the Certificate of Service attached to the Master Sale and Settlement Motion includes references to service upon Jim Moncrief at Tech Pharm, he testified that he never received either the Master Sale and Settlement Motion or the Notice of Hearing on the Master Sale and Settlement Motion.  And, not surprisingly, the evidence regarding service of the Master Sale and Settlement Motion and the related Notice of Hearing is equivocal due to the passage of time. Counsel for the Provider Meds Trustee, David Elmquist, testified that he instructed his assistant to serve the Master Sale and Settlement Motion and the related Notice of Hearing on the master mailing matrices.  His assistant, Karen Bibby, testified that she was so instructed and that she believes she served the Master Sale and Settlement Motion and the related Notice of Hearing as instructed.  She also testified that she was instructed by Mr. Elmquist's paralegal to add Tech Pharm to the service list and that she did so.  The upshot of this testimony is that Tech Pharm was added to the service list and the two referenced pleadings were mailed by first class mail to it by Ms. Bibby.  However, on cross-examination, Mr. Elmquist testified that he had no personal knowledge of whether the two pleadings were properly served on Tech Pharm and that his involvement in the mailing process ended with his instruction to Ms. Bibby.  Moreover, on cross-examination, Ms. Bibby testified that she could not recall this mailing specifically and that her prior testimony relayed what she normally did when serving documents on behalf of the firm, not what happened here specifically.  She also admitted that it was possible that she made a mistake and failed to mail the documents to Tech Pharm.  Ms. Bibby and Mr. Elmquist were both candid and credible witnesses.  The dilemma is that the testimony is equivocal.  In short, based on their testimony, it is possible that Tech Pharm was mailed the Master Sale and Settlement Motion and the related Notice of Hearing, but it is also possible that a mistake was made and Tech Pharm was not mailed copies of those two documents.  Mr. Moncrief was also a credible witness.  He testified

that he is familiar with legal documents and that he reviews them when received in the mail.  And, after reviewing them, if necessary, he consults with an attorney.  He testified that because Tech Pharm is in the pharmacy business, the legal documents that are received in the mail often relate to class actions.  Finally, he testified that he did not receive the Master Sale and Settlement Motion or the related Notice of Hearing in the mail.

75.     On November 5, 2014, the Court entered the Master Sale and Settlement Order in the cases of Provider Meds, OnSite, and San Antonio.  [Provider Meds: Case No. 13-30678, ECF No. 225; OnSite: Case No. 13-30267, ECF No. 205, 206; San Antonio: Case No. 13-33018, ECF No. 163].

76.     It is undisputed that the Master Sale and Settlement Order was never served on Tech Pharm.

77.     The Court cannot find any evidence on its dockets that any of the chapter 7 trustees for the Debtors or RPD served Tech Pharm with any other filings in any of the chapter 7 cases either prior to or after the date of the filing of the Master Sale and Settlement Motion and related Notice of Hearing.

78.     In May 2015, Tech Pharm brought an action in state court against certain of the OnSite Parties (as defined in the License) seeking a declaratory judgment that the License had terminated.

79.     On August 13, 2015, RPD intervened in the state court action and on the same day removed that action to this Court, claiming that it had been granted rights in the License through prior Orders of this Court.

80.     On December 23, 2016, the Court entered an *Order on Motion to Compel RPD Holdings, LLC to Respond to Plaintiff's Request for Production of Documents* [ECF No. 76]. That Order provides, *inter alia*, as follows:

> ORDERED that the sole issue to be tried and determined in this Adversary Proceeding is whether RPD took assignment of, or otherwise acquired any rights in, the License Agreement, that is the subject of the Adversary Proceeding; *provided, however*, notwithstanding the foregoing, RPD shall not assert in this Adversary Proceeding that it has obtained from the bankruptcy estates any rights in, or the assignment of, the License Agreement by way of a lien on the License Agreement, or a credit bid of its secured debt; and it is further

> ORDERED that as a result of the limitations on the scope of the issues to be tried and determined by this Court as set forth in the third decretal paragraph of this Order, no other potential claim between any party against any party is, shall be, or be deemed to be, prejudiced, released, waived, or satisfied, and each party shall otherwise preserve any and all rights with respect to any such other claims. To the extent necessary, any limitations period relating to the enforcement of the License Agreement against RPD shall be tolled for the period during which this Adversary Proceeding has been pending through sixty (60) days following the entry of any final judgment or order in this Adversary Proceeding; *provided, however*, that such tolling shall not be construed as any admission or that any statute of limitations has expired or will expire….

81.     The Court tried this adversary proceeding on January 11, 2017, following which it took the issue in dispute between the parties under advisement.

82.     The findings of fact and conclusions of law set forth herein resolve the issue that remained for trial.

83.     To the extent that any finding of fact set forth above is more properly considered a conclusion of law, it shall be so considered.

## CONCLUSIONS OF LAW[11]

---

[11] While Tech Pharm has raised significant due process issues with respect to the various sale motions, the Court need not reach those knotty legal issue(s) given its other findings and conclusions. To be clear, it is undisputed that Tech Pharm did not receive notice of the Grapevine Sale Motion, the W. Pa. Sale Motion, the Waco Sale Motion, and the hearings on those sale motions. What is less clear is whether Tech Pharm received notice of the Master Sale and Settlement Motion and related hearing. But, because the Court concludes that (i) the License was not sold, transferred or otherwise assigned to RPD pursuant to the Grapevine APA, the W. Pa. APA, the Waco APA and/or the Master Settlement Agreement, and (ii) RPD acquired no rights under the License given its purchase of 16 ADS Machines from the Grapevine Estate and the W. Pa. Estate, Tech Pharm's due process rights were not violated.

**Was the License sold or otherwise transferred to RPD in accordance with 11 U.S.C. § 363 pursuant to the Grapevine APA and the Grapevine Sale Order, the W. Pa. APA and the W. Pa. Sale Order, and/or the Waco APA and the Waco Sale Order?**

1.      The short answer to this question is no, for at least four reasons.  First, none of the relevant parties—*i.e.*, the Grapevine Trustee, the W. Pa. Trustee, the Waco Trustee, and RPD—knew of the existence of the License when the applicable APA was signed and the applicable sale motion was filed.  In fact, the Grapevine Sale Motion and the W. Pa. Sale Motion were heard and the Grapevine Sale Order and the W. Pa. Sale Order were entered months before the Grapevine Trustee, the W. Pa. Trustee, and RPD were even aware of the existence of the License.  These sale orders were entered on January 13, 2014 and the parties learned of the existence of the License no earlier than September 15, 2014, some eight (8) months later.  Moreover, the Waco Sale Motion and the Waco APA were executed and filed with the Court and the Waco Sale Motion was heard by the Court before RPD learned of the existence of the License.  In fact, the parties stipulated that the Waco Trustee had no knowledge of the License at any time prior to the entry of the Waco Sale Order.  *See supra* at Finding of Fact 40.  Under these circumstances it is impossible to conclude that the applicable trustee intended to sell the License to RPD and that RPD intended to buy the License when the Grapevine APA, the W. Pa. APA, and the Waco APA were signed, presented to the Court for approval, and approved by the Court.

2.      Second, while RPD argues that it is possible for the Grapevine Trustee, the W. Pa. Trustee, and the Waco Trustee to sell assets of which she/he was unaware, and for RPD to buy assets of which it was unaware, that could only occur if the Grapevine APA, the W. Pa. APA and/or the Waco APA contained a "catch all" provision to the effect that the applicable trustee was selling all other property of the applicable Debtor's bankruptcy estate to RPD, whatever that property might be.  But, the Grapevine APA, the W. Pa. APA, and the Waco APA do not contain

any such provision. In fact, these APAs have very specific definitions of the "Subject Property" which is to be sold (or, if necessary, assumed and assigned) to RPD—*i.e.*, "[s]ubject to the occurrence of the Effective Date (defined below), the Trustee agrees to sell, convey, and transfer to RPD all of the Debtor's and the Estate's right, title and interest in and to the Subject Property (the "Sale")." *See, e.g.*, Grapevine APA [Ex. 4, Ex. A] at ¶ 1. The definition of the Subject Property in the Grapevine APA and the W. Pa. APA simply did not include the License. While two licenses were included in the definition of Subject Property, they were the OnSite Rx software license and the MDI Achieve sublicense. *Id.* at third whereas clause on p. 1.

3.       Third, essentially admitting that the License was not expressly included within the definition of the "Subject Property" being sold to it in the Grapevine APA and the W. Pa. APA, RPD argues that the License was expressly included within the definition of the "Subject Property" being sold to it pursuant to the Waco APA. The Court disagrees. In making this argument RPD relies on two whereas clauses in the Waco APA. "Subject Property" is defined in the eleventh whereas clause as "the License Agreement, the Intellectual Property, and the Third Party Claims (collectively, the 'Subject Property'), excluding accounts receivables and potential preference avoidance and recovery claims…." Waco APA [Ex. 10, Ex. A] at p. 2. In turn, "Intellectual Property" is defined in the Waco APA in the fourth whereas clause as follows:

> Whereas the Estate may own additional property, rights, claims, and causes of action related to (collectively the 'Intellectual Property'): (i) an ownership interest in source code and software generally known as OnSiteRx; (ii) an ownership interest in unregistered copyrights in the OnSiteRx dispensing software; and (iii) *other potential licenses related to OnSiteRx*, including an MDI Achieve sublicense."

*Id.* at p. 1 (emphasis added). Specifically, RDP argues that the License is included within the "other potential license[s] related to OnSiteRx" language. The Court disagrees because the reference to OnSiteRx is defined earlier in that same whereas clause to refer to "source code and

software generally known as OnSiteRx." The License has nothing to do with source code and software. Moreover, the Court's interpretation of this clause is bolstered by understanding the further reference in the clause to "including an MDI Achieve sublicense," which sublicense did relate to the source code and software as counsel for RPD admitted in closing arguments.

4.      Fourth, the Grapevine Sale Order, the W. Pa. Sale Order, and the Waco Sale Order did not approve the sale (or, if necessary, the assumption and assignment) of any property other than the "Subject Property," as expressly defined in the applicable APA, to RPD. In fact, the Grapevine Sale Order, the W. Pa. Sale Order, and the Waco Sale Order, among other things: (i) granted the respective sale motion, and (ii) approved the sale of the "Subject Property" (as defined in the applicable APA) to RPD. *See, e.g.*, Grapevine Sale Order [Ex. 6] at p. 2. Thus, based upon the express terms of the applicable APA and related sale order, the License was not sold to RPD or assumed and assigned to RPD by the Grapevine Trustee, the W. Pa. Trustee, or the Waco Trustee.

**Did RPD acquire any rights in the License when it purchased certain ADS Machines pursuant to the Grapevine APA and the Grapevine Sale Order and/or the W. Pa. APA and the W. Pa. Sale Order?**

5.      During closing arguments, counsel for RPD raised an issue that was not addressed in the parties' pretrial briefs. Specifically, counsel argued that RPD acquired rights in the License when it purchased 15 ADS Machines from the Grapevine Estate and an ADS Machine from the W. Pa. Estate.

6.      There is no question that RPD purchased 15 ADS Machines and related equipment from the Grapevine Estate in the Grapevine APA and Grapevine Sale Order. Those 15 ADS Machines were expressly included in the definition of the "Subject Property" being sold. Grapevine APA [Ex. 4, Ex. A] at third whereas clause on p. 1.

7.      And, as it relates to the Onsite Machines (as defined in the License), the License expressly provides:

> If an Onsite Machine is used in a long-term care facility ("LTCF") as permitted by an Onsite party pursuant to this License, the Onsite party may sell the Onsite Machine to that LTCF or to a third party purchaser of the Onsite Machine who is not the LTCF.  The LTCF (or a third party purchaser of the Onsite Machine who is not the LTCF) can continue to operate that Onsite Machine currently in place at the time of purchase of said Onsite Machine.  In this scenario, neither the LTCF nor the third party purchaser of the Onsite Machine is an assignee to this Agreement, and thus the LTCF, or third party purchaser of the Onsite Machine does not have any right under this License to expand or purchase any additional Onsite Machines without the consent of Tech [Pharm] ….

License [Ex. 2] at ¶ 3.  For further context, the License itself clarifies that the infringement claims of Tech Pharm that were settled pursuant to the terms of the License were infringement claims "based on making, using, or selling of the Onsite fulfillment machines used by Onsite parties for customers' prescription fulfillment (the 'Onsite Machine(s) and/or 'Machine(s))."  *Id*. at p. 2 first whereas clause.

8.      Thus, Tech Pharm agreed in the License that any existing Onsite Machine that was being used in a LTCF could continue to be used in that facility even if the Onsite Machine was sold to the LTCF or a third party who would continue to use the Onsite Machine at that facility without the LTCF or the third-party purchaser being the subject of an infringement claim for that use by Tech Pharm.  However, under this scenario, there was not an assignment of the License.

9.      So, the question becomes, were the 15 ADS Machines sold to RPD in the Grapevine APA an "Onsite Machine" as defined in the License, the use of which is subject to the limited protection from an infringement claim by Tech Pharm stated above?  On this record the Court cannot so find and/or conclude.  Attached as Exhibit A to the License is a list of "Existing Gravity Fed Strip Packaging Remote Dispensing Machines."  License [Ex. 2, Ex. A].  While those machines are the Onsite Machines addressed in the License that were excepted from the License

Fee otherwise required when a Machine was placed in service thereafter, there is no indication as to which of those Machines, if any, was being used in a LTCF at the time the License was signed. Moreover, even if the Exhibit A Machines were all being used in a LTCF, RPD failed to prove that the 15 ADS Machines it purchased are the same 15 remote dispensing Machines listed on Exhibit A attributable to the Grapevine Estate or that it continues to use those Machines in the same LTCF. While Exhibit A contains what the Court assumes are the serial numbers of each machine listed on Exhibit A, RPD failed to introduce evidence of the serial numbers of the 15 ADS Machines it purchased under the Grapevine APA and the Grapevine Sale Order.

10. RPD also purchased a single ADS Machine and related equipment from the W. Pa. Estate pursuant to the W. Pa. APA and the W. Pa Sale Order. W. Pa. APA [Ex. 7, Ex. A] at third whereas clause on p. 1. However, the same failure of proof exists with respect to this Machine that the Court just explained with respect to the 15 ADS Machines that RPD purchased pursuant to the Grapevine APA and the Grapevine Sale Order.

11. Accordingly, on this record, the Court cannot conclude that RPD acquired any rights in the License when it purchased certain ADS Machines pursuant to the Grapevine APA and the Grapevine Sale Order and/or the W. Pa. APA and the W. Pa. Sale Order.

**Was the License sold or otherwise transferred to RPD in accordance with 11 U.S.C. § 363 pursuant to the Master Settlement Agreement and the Master Sale and Settlement Order?**

12. To recap, and as relevant here, the Debtors who were parties to the Master Settlement Agreement were Provider Meds, San Antonio, and Onsite, each acting through its respective chapter 7 trustee. The short answer to this question is no, for the reasons explained below.

13. First, and simplest, Onsite was not a party to the License and thus the License was not property of the Onsite Estate in accordance with 11 U.S.C. § 541. Obviously, the Onsite

Trustee cannot sell or otherwise transfer property that the Onsite Estate does not own or have an interest in. Thus, the Onsite Trustee did not sell or otherwise transfer the License to RPD in the Master Settlement Agreement.

14. Second, while the Onsite Trustee, the Provider Meds Trustee, and the San Antonio Trustee agreed to sell certain property to both CERx (or its designee) and RPD in the Master Settlement Agreement, the License was not so sold. Rather, these trustees sold to CERX (or its designee) and RPD "all their respective estates' rights, title and interest in the Source Code and the Source Code IP…. Upon consummation of the sale, CERx and PRD will each be concurrent and several owners and each shall own all rights, title and interest in the Source Code and the Source Code IP…." Master Settlement Agreement [Ex. 14, Ex. A] at ¶ IV, 5. b. In turn, "Source Code" and "Source Code IP" are defined terms in the Master Settlement Agreement and such definitions do not include the License. *Id*. at ¶ II, 63-64.

15. Third, the parties stipulated that the San Antonio Trustee had no knowledge of the License at any time prior to the entry of the Master Sale and Settlement Order. *See supra* Finding of Fact 40. Under this circumstance it is impossible to conclude that the San Antonio Trustee intended to sell the License to RPD when the Master Sale and Settlement Motion was signed, presented to the Court for approval, and approved by the Court. Moreover, the Master Settlement Agreement contains no "catch-all" provision transferring all other property of the San Antonio Estate to RPD. While there is a catch-all type provision in the Master Settlement Agreement regarding the San Antonio Trustee's sale of assets of the San Antonio Estate, it runs in favor of CERx, not RPD.[12] Master Settlement Agreement [Ex. 14, Ex. A] at ¶ IV, 5. c.

---

[12] Ironically, this "catch-all" provision expressly identifies the Tech Pharm license as among the property being sold to CERx—*i.e.*, "Cunningham [the San Antonio Trustee] will sell and assign to CERx (or its designee) substantially all other assets of the San Antonio Estate…including, without limitation, … rights to or under the Tech Pharm License." Master Settlement Agreement [Ex. 14, Ex. A] at ¶ IV, 5. c. The Court struggles to reconcile this

16.     Fourth, while "rights to or under" the License are expressly identified as an asset to be sold by the Provider Meds Trustee, Provider Technologies, Inc. (a non-debtor entity),[13] and Pharmacy Technologies, Inc. (a debtor whose trustee did not join in the Master Settlement Agreement or the filing of the Master Sale and Settlement Motion),[14] the party to whom those rights were sold was CERx (or its designee), not RPD. Master Settlement Agreement [Ex. 14, Ex. A] at ¶ IV, 5. d., e., and f. Moreover, the Master Settlement Agreement expressly authorizes CERx, not RPD, "to pursue a Tech Pharm License via ProvideRx of Midland, LLC either by direct negotiation with the trustee or by foreclosing on an assignment of rights from RPD." *Id*. at ¶ IV, 5. g. Thus, while CERx purchased Provider Med's rights to or under the License pursuant to the Master Settlement Agreement, RPD did not.

17.     Fifth, while the Master Settlement Agreement provides that "RPD is entitled to all remaining available Tech Pharm licenses (such as those otherwise acquired from ProvideRx of

---

provision, which expressly identifies the Tech Pharm license, with the parties' last factual stipulation that the San Antonio Trustee had no "actual knowledge of the License at any time prior to the entry of the orders approving the respective motions to sell the property of the respective estates to RPD." *See supra* at Finding of Fact 40. The only logical way to reconcile the Master Settlement Agreement's express terms with the parties' factual stipulation is to conclude that the parties agree that the San Antonio Trustee did not read the Master Settlement Agreement before agreeing to its terms and did not understand the extent of the assets that he owned and was agreeing to sell to CERx, which conclusion, if true, would be most troubling to the Court. However, the Court recognizes that the San Antonio Trustee did not so stipulate.

[13] Oddly, the Master Settlement Agreement provides that "PTI [defined to be Provider Technologies, Inc.] will sell and assign to CERx (or CERx's designee) *PM's* [defined to be Provider Meds] rights to or under the Tech Pharm License." Master Settlement Agreement [Ex. 14, Ex. A] at ¶ IV, 5. e (emphasis added). Of course, PTI cannot sell Provider Meds' rights under the License, only the Provider Meds Trustee can do so.

[14] Pharmacy Technologies, Inc. filed its voluntary petition under chapter 11 in this Court on June 11, 2013. [Case No. 13-33020, ECF No. 1]. Its case was converted to a case under chapter 7 on August 30, 2013 and Scott Seidel ("**Seidel**") was appointed as its chapter 7 trustee. *Id*. at ECF No. 44. Seidel, as trustee, did not (i) authorize this debtor's entry into the Master Settlement Agreement, (ii) join in the filing of the Master Sale and Settlement Motion, and (iii) seek Court approval of the Master Settlement Agreement. In fact, Seidel filed a no asset report in this case on April 2, 2014 and the case was closed on June 25, 2014. Seidel did not abandon any interest Pharmacy Technologies, Inc. has in the License before the case was closed and thus, any such interest remains its property and could be disposed of by Seidel if he sought to reopen the case to administer the asset, which he has not done. *Reed v. City of Arlington*, 650 F.3d 571 (5th Cir. 2011); *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380 (5th Cir. 2008). Of course, this analysis assumes that an asset remains to be administered. If the License was an executory contract that was deemed rejected due to Seidel's failure to assume the License within 60 days of the conversion of this debtor's case to chapter 7, there is no asset to administer. *See infra* at Conclusions of Law 30-32.

Grapevine, LLC; W Pa OnSite Rx; and ProvideRx of Waco, LLC)," *id.* at ¶ IV, 5. h., that provision has no legal effect here as the Court has already concluded that RPD did not purchase or otherwise acquire the License pursuant to the Grapevine APA, the W. Pa. APA, and/or the Waco APA. *See supra* at Conclusions of Law 1-4.

18. Sixth and finally, while the Master Settlement Agreement also provides that "[w]ith respect to any Tech Pharm License belonging to any other entity, RPD and CERx will cooperate, to the extent possible, such that, taking into account any Tech Pharm License previously obtained or obtained pursuant to this Agreement, each shall have rights to the Tech Pharm Licenses as described above," Master Settlement Agreement [Ex. 14, Ex. A] at ¶ IV, 5. i., this language does not sell or otherwise transfer the License from a party to the License to CERx or RPD. It is simply a cooperation agreement between CERx and RPD. Moreover, it cannot grant RPD any legal rights in or to the License because, as a matter of law, CERx cannot legally transfer any "rights to or under the Tech Pharm License" it may have purchased[15] from the Provider Meds Trustee (or any other party) to RPD. This is so because the holder of a non-exclusive license, such as the License, cannot further assign it without the consent of the licensor, here Tech Pharm. *In re LGX, Inc.*, 336 B.R. 601, at *3 (B.A.P. 10th Cir. 2006) ("In the absence of a statute, federal courts have fashioned a rule of federal common law to apply in cases concerning transfers of patent licenses. It is now well settled that a licensee has only a personal and not a property interest in the patent that is not transferable, unless the patent owner authorizes the assignment or the license itself permits assignment." (internal citation and footnote omitted)); *see also Unarco Indus., Inc. v. Kelley Co.,*

---

[15] The Court notes that CERx is not a party to this adversary proceeding. However, the "sale" of the License to CERx suffers from the same flaw as the alleged "sale" to RPD. Specifically, once the License was deemed rejected by the San Antonio Trustee's and the Provider Meds Trustee's failure to assume the License within 60 days of the conversion of the San Antonio Case and the Provider Meds Case to a case under chapter 7 of the Bankruptcy Code, there was no asset for the applicable trustee to sell to CERx. *See infra* at Conclusions of Law 30-34.

*Inc.*, 465 F.2d 1303, 1306 (7th Cir. 1972) ("The long standing federal rule of law with respect to the assignability of patent license agreements provides that these agreements are personal to the licensee and not assignable unless expressly made so in the agreement."). And, while the License allowed the Onsite Parties who were licensees to assign the License "to any party within the United States as part of a sale, acquisition, or change in control of the business to which this Assignment relates…,"[16] License [Ex. 2] at ¶ 2, this provision does not permit an assignee of the License (here, CERx) to further assign the License to another party (here, RPD).

19.     For at least these reasons, the Court concludes that RPD did not purchase or otherwise receive "rights to or under" the License in the Master Settlement Agreement.

**Is the License an Executory Contract that can be sold pursuant to 11 U.S.C. § 363 or must it be assumed and assigned in accordance with 11 U.S.C. § 365?**

20.     For the reasons explained below, the Court concludes that the License is an executory contract that cannot be sold in accordance with section 363(b) of the Bankruptcy Code but rather must be assumed by the applicable trustee in accordance with section 365(a) of the Bankruptcy Code and then assigned by that trustee to RPD in accordance with section 365(f) of the Bankruptcy Code.

21.     The Fifth Circuit has adopted the "Countryman definition," (*Matter of Murexco Petroleum, Inc.,* 15 F.3d 60, 62-63, n.8 (5th Cir. 1994)), to determine if a contract is executory. "[A]n agreement is executory if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing

---

[16] Although the Court does not need to reach this issue, it reads the assignment provision of the License differently than RPD. Specifically, the Court reads the assignment provision to only allow the assignment of the License from a Debtor licensee to any party within the United States as part of a sale of the applicable Debtor licensee's business. Here, there was no sale of the applicable Debtor licensee's business. In fact, each of the Debtor licensee's respective business stopped operating upon the conversion of the applicable case to chapter 7 at the latest. No trustee sought authority to operate any Debtor licensee's business after conversion. Thus, at best, the sale was of specific assets, not the Debtor licensee's "business to which this Agreement [the License] relates." License [Ex. 2] at ¶ 2.

performance of the other party." *Id.* at 62-63. Thus, the Court must first determine whether material obligations remained owing between Tech Pharm as licensor on the one hand and those Debtors who were parties to the License as licensees on the other.

22. As the patent owner licensor, Tech Pharm was required "to refrain from suing [the Debtor licensees] for infringement, since a nonexclusive patent license is, in essence 'a mere waiver of the right to sue' the licensees for infringement." *In re CFLC, Inc.*, 89 F.3d 673, 677 (4th Cir. 1996) (citing *De Forest Radio Tel. Co. v. United States*, 273 U.S. 236, 242 (1927) (quoting Robinson on Patents §§ 806, 808)). *See also Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1045 (9th Cir. 1985), *superseded by statute in part*, Intellectual Property Bankruptcy Protection Act of 1988, Pub. L. No. 100-506, 102 Stat. 2538, ("The unperformed, continuing core obligations of notice and forbearance in licensing made the [license] contract executory as to [the licensor]."). Thus, at the time the Debtor licensees filed their respective bankruptcy petitions, Tech Pharm owed this material obligation of forbearance under the License to those Debtors who were licensees.

23. During closing argument, however, RPD's counsel argued that the License is not a true license, but rather a settlement agreement intended to resolve the Patent Infringement Litigation. RPD argues that, as part of that settlement, Tech Pharm not only agreed to release the claims alleged or that could have been alleged in the Patent Infringement Litigation, it also released all claims related to the Patent. Thus, according to RPD, the License does not obligate Tech Pharm to forbear from suing the Debtor licensees, it *prohibits* Tech Pharm from suing the Debtor licensees. Because of this, RPD argues that Tech Pharm has no ongoing duties under the License, which means that the License is not an executory contract subject to the provisions of 11 U.S.C. § 365. The Court disagrees. For the reasons explained below, this Court finds and concludes that,

as of each Debtor licensees' respective Petition Date and under the express terms of the License: (i) Tech Pharm released its right to sue the Debtor licensees for infringement of the Patent related to Machines placed into service prior to execution of the License; however, (ii) Tech Pharm had an ongoing duty to refrain from suing the Debtor licensees related to new Machines so long as the Debtor licensees performed under the terms of the License. Thus, as of each Petition Date, Tech Pharm owed a material, ongoing duty to the Debtor licensees.

24.     To analyze RPD's argument, we must turn to the language of the License, which is governed by Texas law. License [Ex. 2] at ¶ 10. When interpreting a contract under Texas law, the court's primary concern is to ascertain and give effect to the written expression of the parties' intent. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011); *Seagull Energy E & P, Inc. v. Eland Energy, Inc.,* 207 S.W.3d 342, 345 (Tex. 2006). By this approach, courts "strive to honor the parties' agreement and not remake their contract by reading additional provisions into it." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). The parties' intent is governed by what is written in the contract, not by what one side contends they intended but failed to say. *Id*. at 127. Thus, "it is objective, not subjective, intent that controls." *Matagorda Cnty. Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006) (per curiam) (citing *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968)). A court must therefore give terms their plain and ordinary meaning unless the contract indicates that the parties intended a different meaning. *Dynegy Midstream Servs., Ltd. P'ship. v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009). Moreover, a court does not consider only those parts of a contract that favor one party, *City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005), but examines the writing as a whole to harmonize and give effect to all of the contract's provisions. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

Finally, if the contract's terms are clear and unambiguous, the Court's analysis ends there. *See Tex. v. Am. Tobacco Co.,* 463 F.3d 399, 407 (5th Cir. 2006); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995) (same).

25.     Turning to the License, RPD relies upon paragraphs 5 and 6 in support of its argument. Paragraph 5, titled "Mutual Releases," states that:

> Tech [Pharm] hereby releases he Onsite parties, their agents, servants, employees, attorneys, and customers (the "Onsite Released Parties") from any and all claims which Tech may have or claim to have against the Onsite Released Parties which relate to or could have been claimed in the [Patent Infringement] Litigation, or that relate to the [] Patent or any alleged infringement of same, *except* for the obligations specifically called for under this Agreement.

License [Ex. 2] at ¶ 5 (emphasis added). In turn, paragraph 6, titled "Dismissal of Litigation" states that:

> Upon execution of this [License], the parties authorize their representative attorneys to file any such document(s) as may be needed so as to dismiss the Litigation, including all claims and counterclaims, with prejudice to the refiling of same….

*Id.* at ¶ 6.

26.     With the previously-analyzed precedent in mind, this Court cannot interpret paragraphs 5 and 6 of the License as permanently barring Tech Pharm from suing the Debtor licensees for infringement of the Patent, regardless of when the claims arose. To the contrary, the License separately addresses infringement-related claims existing prior to execution of the License and those arising afterward. Notably, paragraph 4 of the License, titled "Payment of License Fee," requires the Debtor licensees to provide Tech Pharm with a list of Machines previously placed in service, for which no licensing fee is due. For Machines placed into service after execution of the License, the Debtor licensees are required to provide Tech Pharm with a quarterly report identifying such new Machines and to pay a related licensing fee. Reading the License as a whole, its clear intent is to (i) fully release all infringement claims related to the Machines that were

already in service prior to the License, but (ii) require a licensing fee to be paid for any additional Machines placed into service after execution of the License. This reading in bolstered by the release language in paragraph 5, which specifically removes "obligations called for under this [License]" from its scope. Thus, under the License, Tech Pharm owed a material obligation to the Debtor licensees to forebear from suing them for infringement of the Patent related to the Machines placed into service after execution of the License.

27. The Debtor licensees also owed material obligations to Tech Pharm. The Debtor licensees were obligated to (i) provide quarterly reports, "showing all Machines that have been placed in service during the previous calendar quarter,"[17] (ii) make a one-time payment of $4,000.00 to Tech Pharm for each Machine they placed in service,[18] and (iii) refrain from making public statements relating to the settled lawsuit.[19]

28. Given these continuing material obligations owing from both Tech Pharm and the Debtor licensees, the License was an executory contract at the time of each of the Debtor licensee's bankruptcy filings because those obligations were "so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other." *Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d at 1045 (citing *Gloria Mfg. Corp. v. Int'l Ladies' Garment Workers' Union*, 734 F.2d 1020, 1022 (4th Cir. 1984)).

29. The question thus becomes may the applicable trustee sell his/her bankruptcy estate's interest in the License under section 363(b) of the Bankruptcy Code to avoid the time deadlines and more rigorous requirements of section 365 of the Bankruptcy Code? The answer to

---

[17] License [Ex. 2] at ¶ 4
[18] License [Ex. 2] at ¶ 1. While an obligation to pay, standing alone, will not support the characterization of a contract as executory, the obligation to pay is not the only remaining contractual obligation owing from the licensees to Tech Pharm here. *See In re Digicon, Inc.*, 71 F. App'x. 442, at *5 (5th Cir. 2003) (citing *In re Placid Oil Co.*, 72 B.R. 135, 138 (Bankr. N.D. Tex. 1987)).
[19] License [Ex. 2] at ¶ 7

this question is no, as "section 365 is the exclusive means of effectuating assumption and assignment of executory contracts in bankruptcy." *In re MPF Holding U.S. LLC*, 2013 WL 3197658, at *10 (Bankr. S.D. Tex. 2013). *See also In re Taylor*, 198 B.R. 142, 167 (Bankr. S.C. 1996) ("Even though there appears no express statutory provision that excludes the use of § 363(f) by [the debtor], in order to recognize the apparent intentions of drafters of the Bankruptcy Code . . . this Court agrees that § 365 is the necessary avenue which this [d]ebtor must follow before this Court could authorize a transfer of the real property which [the objecting party] has leased." (footnote omitted)); *In re Qintex Entm't, Inc.*, 950 F.2d 1492 (9th Cir. 1991) (implying § 365 is either the exclusive remedy for an executory contract, or an intermediate step prior to a sale). Thus, the trustee for each of the Debtor licensee's bankruptcy estate was required to first assume the License before he/she could assign the License to RPD or any other third party as required by section 365(a) and (f) of the Bankruptcy Code. *In re Mirant Corp.*, 440 F.3d 238, 253 (5th Cir. 2006) ("According to § 365(f)(2)(A), assumption must precede assignment." (citations omitted)); *Cinicola v. Scharffenberger*, 248 F.3d 110, 120 (3rd Cir. 2001) ("Before an executory contract may be assigned, the trustee first must assume the contract and 'adequate assurance of future performance' of the contract must be provided. 11 U.S.C. §§ 365(f)(2)(A), (B). This requirement provides needed protection to the non-debtor party because the assignment relieves the trustee and the bankruptcy estate from liability for breaches arising after the assignment." (footnote omitted)).

**Did the Grapevine Trustee, the W. Pa. Trustee, the Waco Trustee, the San Antonio Trustee and/or the Provider Meds Trustee seek to assume and assign the License to RPD within the statutorily mandated period and, if not, what happened to the License?**

30.     In a chapter 7 case, the trustee has 60 days from the order for relief (here, the date of conversion) within which to assume or reject an executory contract of personal property (here, the License). 11 U.S.C § 365(d)(1). As found previously, no trustee sought to extend the time-period within which he/she could assume the License. Accordingly, and as a matter of law, the

License was deemed rejected in the Grapevine Case, the W. Pa. Case, the Waco Case, the San Antonio Case and the Provider Meds Case upon the expiration of that 60-day period.[20] *Id.* *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 529 (1984) ("[D]uring a Chapter 7 liquidation the trustee has only 60 days from the order for relief in which to decide whether to accept or reject an executory contract. 11 U.S.C. § 365(d)(1)."); *In re Miller*, 282 F.3d 874, 877 (6th Cir. 2002) ("The bankruptcy judge correctly analyzed the effect of section 365 in this case: The trustee did not move to assume or reject [the lease]. Therefore, it was deemed rejected . . . sixty days after the petition was filed.").

31.     Given that the License was deemed rejected before any of the sale motions was filed, as it pertains to the License, there was nothing for the applicable trustee to attempt to assign, sell or otherwise transfer. *In re Mirant Corp.*, 440 F.3d at 253. Thus, RPD obtained no rights in the License pursuant to any of the Court's sale orders.

32.     RPD argues that because the License was not scheduled by the Debtors, somehow the 60-day deadline expressly imposed by section 365(d)(1) of the Bankruptcy Code did not apply and the License was not deemed rejected. Of significance, RPD cites the Court to no authority for its argument. In fact, RPD's counsel admitted during closing argument that he can find no case law or secondary authority to support his argument. The Court is not surprised that there is no such authority, as the express provisions of the Bankruptcy Code are quite clear. If the bankruptcy estate is a party to an executory contract of personal property or an unexpired lease of residential real property, the chapter 7 trustee of that bankruptcy estate must act with respect to that executory contract or unexpired lease within 60 days after the order for relief. 11 U.S.C. § 365(d)(1). If the trustee fails to either (i) extend the time to assume or reject, or (ii) assume the executory contract

---

[20] As previously found, the Onsite Trustee was not a party to the License and thus there was nothing for the Onsite Trustee to assume and assign. *See supra* at Finding of Fact 5.

or unexpired lease within that period, the executory contract or unexpired lease is deemed rejected. *Id*. Congress did not limit the application of section 365 to only those executory contracts or unexpired leases that a debtor chooses to disclose on its schedules. Rather, section 365 applies to "any executory contract or unexpired lease of the debtor." *See, e.g*., 11 U.S.C. § 365(a) ("… the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."). A construction of the Bankruptcy Code consistent with RPD's argument would impermissibly reward a debtor who chooses not to schedule its executory contracts and unexpired leases (or neglects to do so) to the detriment of the contract or lease counterparty. If Congress had felt this appropriate, it could have limited the application of section 365 to executory contracts or unexpired leases that the debtor scheduled on Schedule G. It did not, so neither will this Court. Here, the applicable trustee had 60 days following conversion to investigate whether there were any executory contracts of personal property or unexpired leases of residential real property that she/he should address—whether scheduled or not. And, having failed to act with respect to the License here, the License was deemed rejected after the 60th day following conversion as a matter of law.

33. RPD goes on to argue that even if the License was an executory contract that was deemed rejected following the expiration of the applicable 60-day period, the effect of rejection is simply a breach of the License by that licensee thereby excusing Tech Pharm from its obligation under the License. To this extent, the Court agrees with RPD's argument. There is substantial case law holding that rejection is not a termination of the executory contract; rather, it is a breach of the contract by the debtor/trustee who rejected the contract. *Stewart Title Guar. Co. v. Old Republic Nat. Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996) ("The Code states that, except in certain narrowly circumscribed instances [such as the rejection of timeshare plans and contracts

for the sale of real property], rejection of an executory contract or lease constitutes a material breach." (footnotes omitted)); *Matter of Austin Dev. Co.*, 19 F.3d 1077, 1082 (5th Cir. 1994) ("Throughout § 365, rejection refers to the debtor's decision not to assume a burdensome lease or executory contract. Section 365(g) states that rejection of a lease 'constitutes a breach' except as provided in subsections (h)(2) and (i)(2).").

34.     Finally, RPD argues, however, that following rejection under section 365 of the Bankruptcy Code, the applicable trustee can then sell the applicable bankruptcy estate's interest in the now-breached License to it under section 363 of the Bankruptcy Code.  While the Court questions why anyone would be willing to buy a breached contract, when the effect of the breach has excused the counterparty from performing further under the contract, the Court concludes that it need not reach this rather novel legal argument here because even if a trustee could sell the bankruptcy estate's residual interest in a rejected (breached) executory contract under section 363 of the Bankruptcy Code, none of the applicable Trustees did so here.  As explained above, no Trustee sold the License to RPD under the terms of the applicable APA or the Master Settlement Agreement.  *See supra* at Conclusions of Law 1-4 and 12-19.

35.     To the extent that any conclusion of law set forth above is more properly considered a finding of fact, it shall be so considered.

**### End of Findings of Fact and Conclusions of Law Following Trial ###**